AO 106 (Rev. 04/10)  Application for a Search Warrant (Modified: WAWD 10-26-18)

# UNITED STATES DISTRICT COURT

for the

Western District of Washington

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>2019 Jeep Cherokee bearing Oregon license plate<br>073PDC [SUBJECT VEHICLE], as described in<br>Attachment A | )<br>)<br>)<br>)<br>)<br>) |

Case No.    MJ24-536

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

The Subject Vehicle as further described in Attachment A, which is attached hereto and incorporated herein by this reference.

located in the _____Western_____ District of _____Washington_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 8, U.S.C. §§ 1324(a)(1)(A)(ii),<br>Title 8, U.S.C. §§ 1324(a)2)(B)(ii), and<br>Title 8, U.S.C. §§ 1324(a)(1)(A)(v)(I) | Alien Smuggling |

The application is based on these facts:

✓ See attached Affidavit continued on the attached sheet

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Pursuant to Fed. R. Crim. P. 4.1, this warrant is presented: ☑ by reliable electronic means; or: ☐ telephonically recorded.

_____
*Applicant's signature*

David J. Spitzer, Special Agent
*Printed name and title*

○ The foregoing affidavit was sworn to before me and signed in my presence, or
◉ The above-named agent provided a sworn statement attesting to the truth of the foregoing affidavit by telephone.

Date:    08/29/2024          _____
*Judge's signature*

City and state:  Seattle, Washington          Brian A. Tsuchida, United States Magistrate Judge
*Printed name and title*

## ATTACHMENT A

### Vehicle to be Searched

The **SUBJECT VEHICLE** is a gray 2019 Jeep Cherokee bearing Oregon license plate number 073PDC and registered to Jesus Ortiz Plata and Blanca Elia Zamarripa Cruz, 465 S 13th Street, Independence, OR 97351, that was seized from Jesus ORTIZ-Plata at the time of his arrest on May 23, 2024, and currently stored at the Bellingham Border Patrol Station, located at 1431 Sunset Avenue, Ferndale, Washington 98248.
And any digital device/s or other electronic storage media found therein.

The requested authority to search extends to all areas of the vehicle, all compartments, and all containers within that vehicle, whether locked or not, where the items described in Attachment B could reasonably be found.





ATTACHMENT A
USAO #2023R01258

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

# ATTACHMENT B

## Items to be Seized

The following records, documents, files, or materials, in whatever form, including handmade or mechanical form (such as printed, written, handwritten, or typed); photocopies or other photographic form; and electrical, electronic, and magnetic form (such as tapes, cassettes, hard disks, floppy disks, diskettes, compact discs, CD-ROMs, DVDs, optical discs, Zip cartridges, printer buffers, smart cards, or electronic notebooks, or any other electronic storage medium) that constitute evidence, instrumentalities, or fruits of violations of 8 U.S.C. §§ 1324(a)(1)(A)(ii), (a)(2)(B)(ii), and (a)(1)(A)(v)(I) (hereinafter referred to collectively as "Target Offenses"), those violations involving Jesus ORTIZ-Plata and others unknown, and occurring from January 2022 through May 2024:

1.      All records relating to violations of the Target Offenses, including:

        a.      Records of alien smuggling transactions and activities including, but not limited to, documentary records and ledgers;

        b.      Residential rental agreements, vehicle rental agreements, storage facility rental agreements, records of mail services;

        c.      Airline ticket receipts, vehicle rental receipts, credit card receipts, hotel receipts, travel agency vouchers, long distance telephone call records and other items reflecting domestic and foreign travel;

        d.      Maps reflecting smuggling routes, foreign fuel receipts, receipts reflecting travel to and from foreign countries, receipts pertaining to the purchase and registration of load vehicles, showing modifications to and repairs of vehicles, receipts for portable radios, cellular phones, and pagers

2.      U.S. Currency, money orders, prepaid/gift cards, and financial records, including bank records, safe deposit box records and keys, credit card records, bills, receipts, tax returns, vehicle documents, and similar items; and other records that show income and expenditures, net worth, money transfers, wire transmittals, negotiable instruments, bank drafts, cashier's checks, and similar items, and money counters.

ATTACHMENT B - 1
USAO #2023R01258

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

3.      Indicia of ownership or control over any vehicles including, but not limited to: titles, registrations, gas receipts, repair bills, and keys belonging to that vehicle;

4.      Digital devices or other electronic storage media and/or their components, which include:

a.      Any digital device or other electronic storage media capable of being used to commit, further, or store evidence of the offenses listed above;

b.      Any digital devices or other electronic storage media used to facilitate the transmission, creation, display, encoding or storage of data, including word processing equipment, modems, docking stations, monitors, cameras, printers, plotters, encryption devices, and optical scanners;

c.      Any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-R, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, and personal digital assistants;

d.      Any documentation, operating logs and reference manuals regarding the operation of the digital device or other electronic storage media or software;

e.      Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices, or data to be searched;

f.      Any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer equipment, storage devices or data; and

g.      Any passwords, password files, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or data.

5.      For any digital device or other electronic storage media upon which electronically stored information that is called for by this warrant may be contained, or that may contain things otherwise called for by this warrant:

ATTACHMENT B - 2
USAO #2023R01258

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

a.      Evidence of who used, owned, or controlled the digital device or other electronic storage media at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.      evidence of software that would allow others to control the digital device or other electronic storage media, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.      evidence of the lack of such malicious software;

d.      evidence of the attachment to the digital device of other storage devices or similar containers for electronic evidence;

e.      evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the digital device or other electronic storage media;

f.      evidence of the times the digital device or other electronic storage media was used;

g.      passwords, encryption keys, and other access devices that may be necessary to access the digital device or other electronic storage media;

h.      documentation and manuals that may be necessary to access the digital device or other electronic storage media or to conduct a forensic examination of the digital device or other electronic storage media;

i.      contextual information necessary to understand the evidence described in this attachment.

6.      Cell Phones: Cellular telephones and other communications devices may be seized, and searched for the following items:

a.      Assigned number and identifying telephone serial number (ESN, MIN, IMSI, or IMEI);

b.      Stored list of recent received, sent, and missed calls;

c.      Stored contact information;

ATTACHMENT B - 3
USAO #2023R01258

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

d.      Stored photographs and videos of narcotics, currency, evidence of suspected criminal activity, and/or the user of the phone and/or co-conspirators, including any embedded GPS data associated with these photographs;

e.      Stored text messages, as well as any messages in any internet messaging apps, including but not limited to Facebook Messenger, iMessage, Wickr, Telegram, Signal, WhatsApp, Kik, and similar messaging applications, related to the aforementioned crimes of investigation or that may show the user of the phone and/or co-conspirators, including Apple iMessages, Blackberry Messenger messages or other similar messaging services where the data is stored on the telephone;

f.      Stored documents, notes, and files that contain passwords/or encryption keys; and

g.      Evidence of user attribution showing who used or owned the cellular phone at the time the items described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames or passwords, and documents.

THE SEIZURE OF DIGITAL DEVICES OR OTHER ELECTRONIC STORAGE

MEDIA AND/OR THEIR COMPONENTS AS SET FORTH HEREIN IS

SPECIFICALLY AUTHORIZED BY THIS SEARCH WARRANT, NOT ONLY TO

THE EXTENT THAT SUCH DIGITAL DEVICES OR OTHER ELECTRONIC

STORAGE MEDIA CONSTITUTE INSTRUMENTALITIES OF THE CRIMINAL

ACTIVITY DESCRIBED ABOVE, BUT ALSO FOR THE PURPOSE OF THE

CONDUCTING OFF-SITE EXAMINATIONS OF THEIR CONTENTS FOR

EVIDENCE, INSTRUMENTALITIES, OR FRUITS OF THE AFOREMENTIONED

CRIMES.

ATTACHMENT B - 4
USAO #2023R01258

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

# AFFIDAVIT

STATE OF WASHINGTON    )
                       )      ss
COUNTY OF KING         )


I, DAVID J. SPITZER, a Special Agent with Homeland Security Investigations, Blaine, Washington, being first duly sworn on oath, depose and say:

## INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent with Homeland Security Investigations (HSI) and have been so employed since January 2020. In February 2021, I graduated from the Criminal Investigator Training Program and the Homeland Security Investigations Special Agent Training Program at the Federal Law Enforcement Training Centers (FLETC) in Glynco, Georgia. While at FLETC, I received nearly 1000 hours of training in such areas including, but not limited to criminal law, human smuggling/trafficking investigations, and criminal procedures. Prior to being employed with HSI, I was employed as an agent with the United States Border Patrol (USBP) for eleven years and was assigned to the Sector Intelligence Units in El Centro, CA, and Blaine, Washington. In this capacity, I was responsible for conducting criminal investigations regarding the violation of immigration laws of the United States. In 2009, I graduated from the United States Border Patrol Academy at the FLETC in Artesia, New Mexico. My education includes a Bachelor of Arts degree in Political Science and a Bachelor of Arts degree in Criminology from the University of Florida.

2.      I am assigned to HSI's Border Security Enforcement Team (BEST) and Air and Marine group in Blaine, Washington (hereinafter "HSI Blaine"), which focuses on the enforcement of immigration and narcotics laws, including human trafficking and smuggling, as well as the investigation of transnational gangs. I am an investigative law

AFFIDAVIT OF DAVID SPITZER - 1
USAO #2023R01258

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7). As such, I am authorized to investigate and enforce violations of federal criminal statutes, including those in Titles 8, 18, and 21 of the United States Code.

3.      The information in this Affidavit is based upon the investigation I have conducted in this case, my conversations with other law enforcement officers who have engaged in various aspects of this investigation, and my review of reports written by other law enforcement officers involved in this investigation. Because this Affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only those facts that I believe are relevant to a determination of probable cause to support the issuance of the requested warrant. When the statements of others are set forth in this Affidavit, they are set forth in substance and in part. Times listed in the Affidavit are approximate.

## PURPOSE OF THIS AFFIDAVIT

4.      I make this Affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure to obtain a warrant authorizing the search of the following vehicle used by Jesus ORTIZ-Plata, aka "Chuy."

        a.      A gray 2019 Jeep Cherokee bearing Oregon license plate number 073PDC and registered to Jesus Ortiz Plata and Blanca Elia Zamarripa Cruz, 465 S 13th Street, Independence, OR 97351, (hereinafter the "**SUBJECT VEHICLE**") further described in Attachment A, for the property and items described in Attachment B, as well as any digital devices or other electronic storage media located therein.

5.      Based on the facts set forth in this Affidavit, there is probable cause to believe that evidence, fruits, and instrumentalities of violations of 8 U.S.C. §§ 1324(a)(1)(A)(ii), (a)(2)(B)(ii), and (a)(1)(A)(v)(I), Alien Smuggling,[1] (hereinafter, referred to as Target Offenses) will be found in the **SUBJECT VEHICLE**.

---

[1] The word "Alien" is used in Title 8 of the United States Code. Throughout this affidavit, and consistent with Executive Branch policy, the author uses the term "noncitizen" in lieu of the term "alien."

AFFIDAVIT OF DAVID SPITZER - 2
USAO #2023R01258

6.  For the **SUBJECT VEHICLE**, the requested authority to search extends to all areas of the vehicle, all compartments, and all containers within that vehicle, whether locked or not, where the items described in Attachment B could reasonably be found.

## BACKGROUND ON UNDOCUMENTED NONCITIZEN SMUGGLING ORGANIZATIONS

7.  I know from training and experience that 8 U.S.C. § 1324(a)(1)(A)(i) makes it illegal to bring, or attempt to bring, an undocumented noncitizen to the United States in any matter whatsoever other than at a designated port of entry or a place other than as designated by the Secretary of the Department of Homeland Security. I also know that this section applies regardless of whether an undocumented noncitizen has received prior official authorization to come to, enter, or reside in the United States.

8.  In addition, 8 U.S.C. § 1324(a)(2)(B)(ii) makes it illegal to knowingly or in reckless disregard of the fact that an undocumented noncitizen has not received prior official authorization to come to, enter, or reside in the United States, bring or attempt to bring to the United States whatsoever, such undocumented noncitizen for private financial gain.

9.  Further, 8 U.S.C. § 1324(a)(1)(A)(v)(II) makes it unlawful to aid or abet the commission of the crimes listed in § 1324(a)(1)(A). And 18 U.S.C. § 2 prohibits aiding or abetting the commission of any offense against the United States.

10.  From my training and experience as an HSI Special Agent, I know that undocumented noncitizens who cannot secure non-immigrant or immigrant visas to lawfully enter the United States generally choose instead to enter the United States illegally[2] between the ports of entry on the southern and northern borders.

---

[2] As used here, and throughout this affidavit, an illegal entry into the United States means an entry at a place not designated as a port of entry. For each of the illegal entries in this affidavit, the noncitizens illegally entering the United States were not in possession of any immigration documents that would allow them to enter into, pass through, or remain in the United States.

AFFIDAVIT OF DAVID SPITZER - 3
USAO #2023R01258

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

11.     Because of their general unfamiliarity with the terrain and border environment or with the methods and routes used to successfully cross the border without detection by government officials, undocumented noncitizens seeking to enter the United States without inspection frequently hire individuals, known as smugglers, who have experience bringing individuals into the United States without detection.

12.     Several undocumented noncitizen smuggling organizations operate in the lower mainland of British Columbia, Canada. These organizations typically charge undocumented noncitizens between $5,000 and $10,000 (USD) to be illegally brought across the U.S. border. Fees charged by these organizations vary on different factors. This can include if an undocumented noncitizen is housed by the organization during their illegal border crossing, or if the organization transports the undocumented noncitizen a significant distance during the illegal entry. The relative risk of the route used to enter the U.S. is also a factor that can affect the fee.

13.     Undocumented noncitizen smuggling organizations operating in the lower mainland of British Columbia typically have U.S. associates who pick up the undocumented noncitizens once they cross the border illegally. These U.S. associates typically transport the undocumented noncitizens to the Seattle area, where associates may then assist the undocumented noncitizens with travel arrangements to other U.S. locations. These undocumented noncitizen smuggling organizations may assist in facilitating a driver to transport undocumented noncitizens to other states, as many illegal entrants lack the identification required to travel by air or other mass transportation.

14.     I also know that persons who are smuggled into the United States may be attempting to circumvent the United States criminal justice system. Persons who are smuggled often have criminal or administrative charges against them which would prevent their lawful admission into the United States. Persons who are smuggled may also be actively participating in other criminal conspiracies with one another at the time

AFFIDAVIT OF DAVID SPITZER - 4
USAO #2023R01258

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

of their smuggling into the United States and are smuggled for the purposed of
concealing those ongoing schemes.

15.     The motivation for a human smuggler to bring a person across the
international border may vary. Sometimes, the arrangement is a simple monetary
transaction. Other times, a smuggler may be doing a personal favor, repaying a personal
debt, or may be actively trying to conceal involvement in other nefarious activities such
as human trafficking.

### STATEMENT OF PROBABLE CAUSE

### A.     Identification of Smuggling Organization

16.     Based upon information obtained during investigations of human
smuggling into the United States through Blaine, Washington. Border Patrol Intelligence
agents identified the phone number, (360) 618-1885 (hereinafter, referred to as TT1) as
being associated with at least six different human smuggling events.

17.     Information obtained during the investigation indicates that smuggling
organizations are using cellular telephones to direct noncitizens before and during their
unlawful entry into the United States, as well as to coordinate the pick-up of the
noncitizens once they have unlawfully crossed into the United States. TT1 is associated
with an individual identified through interviews and cellular phone analysis as "Chuy."

18.     Specifically, on September 18, 2022, at approximately 2:12 a.m., Border
Patrol Agents (BPAs) assigned to the Sumas Station arrested two Mexican nationals
unlawfully entering the United States near Sumas, Washington. Based upon subsequent
interviews, E.S.P.[3] and J.S.C.[4] were provided TT1 by the Canadian-based facilitator and

---

[3] E.S.P. provided a voluntary statement to BPAs subsequent to his/her unlawful entry into the United States. E.S.P.'s only criminal history is related to his/her unlawful entry into the United States. E.S.P. is not receiving any benefit for providing the information.
[4] J.S.C. provided a voluntary statement to BPAs subsequent to his/her unlawful entry into the United States. J.S.C.'s only criminal history is related to his/her unlawful entry into the United States. J.S.C. is not receiving any benefit for providing the information.

AFFIDAVIT OF DAVID SPITZER - 5
USAO #2023R01258

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

told them that "Chuy" would pick them up after their unlawful entry into the United States and drive them to Oregon.

19.     On November 26, 2022, at approximately 6:30 p.m., Border Patrol Agents assigned to the Sumas Station arrested five Mexican nationals unlawfully entering the United States near Sumas, Washington. A post-arrest interview of I.A.C.[5] revealed that her father made arrangements with a smuggler named "Chuy" and provided TT1 as "Chuy's" phone number. I.A.C. further stated that "Chuy" was responsible for successfully smuggling many people previously into the United Sates.

20.     On December 3, 2022, Border Patrol Agents assigned to Blaine Station arrested four Mexican nationals attempting to unlawfully enter the United States near Blaine, Washington. One of the noncitizens, E.G.I.[6], had a contact in his/her phone of TT1 listed as "Juan Pablo" and multiple WhatsApp[7] messages between E.G.I. and the user of TT1 referencing smuggling.

21.     As later described throughout this Affidavit, "Chuy" has been identified as Jesus ORTIZ-Plata with a listed address on his driver license in Independence, Oregon. ORTIZ, a Mexican national, is an undocumented noncitizen with no known criminal history.

**B.     Seizure of Criminal Proceeds in Nebraska**

22.     On September 26, 2022, a vehicle stop was conducted by the Seward County Sheriff's Department on Interstate 80 in Seward, Nebraska on a rental vehicle

---

[5] I.A.C. provided a voluntary statement to BPAs subsequent to his/her unlawful entry into the United States. I.A.C.'s only criminal history is related to his/her unlawful entry into the United States. I.A.C. is not receiving any benefit for providing the information.

[6] E.G.I. provided a voluntary statement to BPAs subsequent to his/her unlawful entry into the United States. E.G.I.'s only criminal history is related to his/her unlawful entry into the United States. E.G.I. is not receiving any benefit for providing the information.

[7] Based upon my training and experience, I know that WhatsApp is an open-source messaging application available on both Android and iPhone smart phones, and Apple and Windows personal computers. I know that the account number for a WhatsApp account must be associated with a cellular telephone number. I also know that to log into a WhatsApp account from another digital device, i.e., that is not associated with the telephone number for the WhatsApp account, a user must have access to the cellular telephone associated with the account for initial login on a new device.

AFFIDAVIT OF DAVID SPITZER - 6
USAO #2023R01258

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

with two occupants. The driver was identified as Joaquin MENESES-Hernandez with an address of 520 Queen Avenue SE in Albany, Oregon. The passenger in the vehicle was Jesus ORTIZ Plata. The vehicle was identified as a rental vehicle which, according to the subjects, was rented by ORTIZ's wife.

23.     The driver stated that he did not have a "green card" and freely admitted to entering the United States from Canada approximately "three or four months ago." The subjects informed officers that they were coming from Chicago after dropping off a lady named "Alma." While ORTIZ stated that the woman's last name was "Hernandez," MENESES did not know her last name.

24.     During the encounter, officers noticed several indicators of criminal activity, including the rental car without the renter present in the vehicle and a non-listed rental driver, the short duration of the trip to Chicago, the driver not knowing the last name of the woman they dropped off in Chicago, and the driver's age did not match the date of birth given when asked multiple times. Based on these indicators, deputies requested consent to search the vehicle, which was verbally given by both MENESES and ORTIZ.

25.     During a search of the rear cargo area, a partial roll of duct tape was found in one of the bags. A few minutes later, deputies discovered a duct taped covered package. The package was opened and determined to be large amount of United States currency. The package was concealed between the rear seat and rear cargo area underneath a carpeted/molding area. In my experience, contraband including proceeds of criminal activity is often concealed to avoid being found during casual encounters with law enforcement.

26.     Based upon the above listed indicators, statements from both subjects that there were no large amounts of cash or currency in the vehicle, and the method of concealment, the currency was seized as criminal proceeds. Both subjects signed abandonment forms and were released from the scene. A later count of the currency was

AFFIDAVIT OF DAVID SPITZER - 7
USAO #2023R01258

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

conducted and totaled $13,400. Based on my experience, the statements made by the vehicle's occupants, and the observations made by the officers, I believe this money to be criminal proceeds of human smuggling.

**C.     July 2023 Smuggling Event**

27.     On July 18, 2023, Border Patrol Agents assigned to the Blaine Station conducted a vehicle stop on a Chrysler Pacifica minivan after it was observed multiple times in a short period of time near the United States – Canada International Boundary in an area known for human smuggling. Based upon interviews with the occupants of the vehicle, it was determined that there were seven undocumented noncitizen passengers in the vehicle that had just unlawfully crossed from Canada into the United States.

28.     During a custodial interview with one of the two United States citizen smugglers encountered in the vehicle and a potential source of information (hereinafter referred to as "CS-1"),[8] CS-1 stated that he/she had been in contact with the user of TT1 before and during the attempted smuggling event. CS-1 stated that the user of TT1 goes by the moniker "Chuy." According to CS-1, "Chuy"[9] is a human smuggler that, on several occasions, has instructed him/her when and where to pick up people near the U.S – Canada International Boundary. CS-1 informed investigators that he/she had picked up undocumented noncitizens for "Chuy" on at least three previous occasions and would personally deliver them to "Chuy" in Oregon. For these services, CS-1 stated that "Chuy" agreed to pay him/her $500 per person. CS-1 further mentioned that "Chuy" works with

---

[8]CS-1 is cooperating with HSI in hopes of potential prosecutorial consideration given his/her concern that he/she would be implicated in the illegal conduct targeted by this investigation. CS-1's only criminal history is related to the smuggling event involving ORTIZ in July 2023. CS-1 has not previously been a confidential informant with HSI or any other law enforcement agency. CS-1 has provided background information on ORTIZ via statements and/or cellular phone analysis. The information provided by CS-1 has been corroborated through other means and has been shown to be reliable.

[9] When describing interviews conducted throughout this affidavit, I use the moniker "Chuy" instead of ORTIZ because that is the name that the interviewee is given regarding the target of this investigation. It should be noted that none of the people interviewed thus far in this investigation know "Chuy's" real identity.

AFFIDAVIT OF DAVID SPITZER - 8
USAO #2023R01258

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

other human smugglers in Canada, and one of their main smuggling routes was to smuggle people into the United States from Canada on trains.

29.     CS-1 voluntarily granted agents written consent to search his/her phone. During a review of the phone, I observed communications on the WhatsApp application with TT1 that corroborated the information given during the interview.

30.     Six of the seven undocumented noncitizens admitted to making arrangements with "Chuy" to be smuggled illegally into the United States. Two of the noncitizens provided TT1 to agents as the phone number for "Chuy." They admitted to previously being in contact with Chuy prior to their illegal entry into the United States.

31.     During one of the post-arrest statements, Y.R.T.[10] stated that when he/she spoke to "Chuy" on TT1 in Canada, he/she asked him if he helps cross people into the U.S. and he stated, "Yes, I do it from time to time."

**D.     Association of TT1 to Target of Investigation, Jesus ORTIZ-Plata aka "Chuy"**

32.     On November 27, 2023, at approximately 4:00 p.m., I spoke with CS-1 via telephone, during which time he/she confirmed the information given months prior and informed me that the user of TT1 is the same individual that goes by "Chuy." On at least three occasions, at "Chuy's" direction, via in-person meeting and/or by telephone using TT1, he/she was asked to travel to Blaine, Washington, at a predetermined location near the border that was given via WhatsApp message from "Chuy" via TT1 to pick up people and deliver them to an Oregon gas station in exchange for $500 per person.[11] According to CS-1, he/she hasn't spoken to "Chuy" in several months.

---

[10] Y.R.T. provided a voluntary statement to BPAs subsequent to his/her unlawful entry into the United States. Y.R.T.'s only criminal history is related to his/her unlawful entry into the United States. Y.R.T. is not receiving any benefit for providing the information.

[11] According to CS-1, he/she has spoken to "Chuy" using TT1 on numerous occasions and knows that the user of TT1 is ORTIZ (aka "Chuy") based upon both phone conversations and face-to-face meetings.

33.     On November 29, 2023, at approximately 2:55 p.m., HSI Portland Special Agents (SAs) conducted a consensual interview with CS-1 and presented him/her with a six-pack photographic lineup. When asked if he/she recognized anyone, CS-1 informed agents that photograph number 4 depicted "Chuy." The photograph identified by CS-1 depicted the driver license photograph of Jesus ORTIZ-Plata.

### E.     Train Smuggling Events

34.     On August 31, 2023, at approximately 1:00 a.m., Customs and Border Protection (CBP) officers assigned to the rail facility in Blaine, Washington, observed x-ray anomalies of possible concealed persons inside a rail car containing bulk plastic pellets. After searching the rail car, CBP officers found 29 undocumented noncitizens attempting to conceal themselves. 28 of the subjects were determined to be Mexican nationals, while one was a Colombian national and identified as the individual guiding the group and instructing people where to hide and how to conceal themselves from detection by law enforcement.

35.     Interviews were conducted with the Mexican nationals and several of them stated that they made arrangements with "Chuy." At least one of the noncitizens was able to provide agents with "Chuy's" phone number and agents confirmed that it was TT1.

36.     On November 10, 2023, at approximately 11:00 p.m., CBP officers intercepted another train and found 13 Mexican nationals, many of which attempted to abscond after the train was ordered to stop by CBP officers.

37.     During the subsequent interviews with the noncitizens, it was determined that three of the subjects had been in contact with "Chuy" using TT1 both while in Mexico and in Canada. Two of the individuals stated that they made arrangements with "Chuy" to be smuggled into the United States unlawfully and agreed to pay "Chuy" $8,000 upon successfully being transported to Oregon.

AFFIDAVIT OF DAVID SPITZER - 10
USAO #2023R01258

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**F.    Interview with CS-2**

38.    On October 12, 2023, HSI SAs and BPAs conducted a consensual encounter with another potential source of information (hereinafter referred to as "CS-2") regarding this human smuggling organization.[12] After CS-2 agreed to speak to agents, he/she was shown a photo of Jesus ORTIZ-Plata. CS-2 stated that the individual in the photo was an individual he/she knew only as "Chuy." When asked how he/she knew "Chuy," CS-2 stated that he/she used to deliver undocumented noncitizens to him in Marysville, Washington. CS-2 further stated that it was his/her role to pick up these undocumented noncitizens after their unlawful entry into the United States and drive them from Bellingham, Washington, to the Seattle metropolitan area. CS-2 informed agents that he/she would be compensated $500 per person and would be paid by an associate of "Chuy." CS-2 told agents that he/she would deliver between four and seven noncitizens to "Chuy" directly in either Marysville or Everett, Washington. CS-2 stated that he/she believed the noncitizens that he picked up in Bellingham and took to "Chuy" had entered the United States unlawfully via a train from Canada. CS-2 has not been in contact with "Chuy" for approximately the last eight months and does not remember what phone number he used to use to contact him.

**G.    Surveillance Footage of Jesus ORTIZ-Plata on November 6, 2023**

39.    On October 20, 2023, Border Patrol Agents assigned to the Blaine Sector Intelligence Unit learned that the **SUBJECT VEHICLE**, had been observed the previous day parked at the Quality Inn and Suites in Everett, Washington. On or about October 24, 2023, agents requested that a hotel employee notify law enforcement if ORTIZ checks into the hotel in the future.

---

[12] CS-2 is cooperating with HSI in the hopes of receiving immigration benefits. CS-2 has a criminal history related to his/her unlawful entry into the United States. CS-2 is subject to an outstanding order of removal issued by an immigration judge, in absentia. Due to his/her cooperation in this investigation, HSI in currently in the process of looking to issue deferred action to the subject. CS-2 has not previously been a confidential informant with HSI or any other law enforcement agency. CS-2 has provided background information on targets of this investigation. To date, the information provided by CS-2 has been corroborated through other means and has been shown to be reliable.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

40.     On November 6, 2023, at approximately 2:15 a.m., Border Patrol Intelligence Agent Manuel Robles was informed by a hotel employee of the Quality Inn and Suites in Everett, Washington that ORTIZ had checked into their hotel. On November 7, 2023, I retrieved a copy of pertinent surveillance video, from the hotel employee, of ORTIZ's stay, which lasted only a few hours.

41.     According to the surveillance footage, on November 6, 2023, ORTIZ entered the parking lot driving the **SUBJECT VEHICLE** at approximately 1:56 a.m. Based on my knowledge of this case and physical surveillance of ORTIZ, I know that the **SUBJECT VEHICLE** is the same one observed in the parking lot of the Quality Inn and Suites mentioned above in paragraph 39.

42.     ORTIZ exited the **SUBJECT VEHICLE** and entered the hotel to check in at the front desk. At check in, ORTIZ provided his contact information to the hotel employee, including a phone number, driver license, credit card, and vehicle information.[13] The phone number provided by ORTIZ (971-428-4605) is registered to his wife, Blanca ZAMARRIPA-Cruz and it is unknown whether ORTIZ is in possession of that device. After checking in, ORTIZ returned to the **SUBJECT VEHICLE**, unloaded one suitcase out of the cargo area of the **SUBJECT VEHICLE**, and then returned inside to the hotel and entered his room at approximately 2:09 a.m.

43.     At approximately 2:29 a.m., ORTIZ left his room, returned to the **SUBJECT VEHICLE**, and exited the property in his vehicle at approximately 2:32 a.m. At approximately, 2:56 a.m., the **SUBJECT VEHICLE** was observed reentering the parking lot of the hotel and parked.

44.     Approximately a minute later, ORTIZ exited the **SUBJECT VEHICLE** along with three individuals from the passenger area. ORTIZ then opened the rear cargo area of the **SUBJECT VEHICLE** and one more person exited from that area of the

---

[13] This information, given by ORTIZ during the standard reservation and check-in process, was obtained through a request to the hotel manager and was found on the hotel invoice.

AFFIDAVIT OF DAVID SPITZER - 12
USAO #2023R01258

**SUBJECT VEHICLE**. In my experience, human smugglers oftentimes move more people than they have room in their vehicle or attempt to conceal the number of people in the vehicle by instructing people to hide in the trunk or rear cargo area. Based on my knowledge of the **SUBJECT VEHICLE**, I do not believe there to be any passenger restraints in the rear cargo area. Since ORTIZ was gone for approximately 24 minutes, it is unknown how long this subject would have been in the rear cargo area of the **SUBJECT VEHICLE** unrestrained.



45.     At 2:57 a.m., a total of five individuals walked into the hotel in a single-file line with ORTIZ leading the way with little to no interaction among those in the group. It should also be noted that the four individuals who followed ORTIZ were dressed in dark clothing and carried no personal items. In my experience, this type of activity is typical of human smuggling, and I have observed this same behavior in hundreds of human smuggling cases I have encountered throughout my career.

AFFIDAVIT OF DAVID SPITZER - 13
USAO #2023R01258

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101
(206) 553-7970

1
2
3
4
5
6
7
8
9



10   46.     At approximately 2:58 a.m., all five individuals entered the same hotel

11  room. Almost immediately upon entering the hotel room with the unknown subjects,

12  ORTIZ left the room and returned to the **SUBJECT VEHICLE** and entered the driver's

13  seat. After sitting in it for several minutes, the **SUBJECT VEHICLE** backed out of the

14  parking space. The **SUBJECT VEHICLE** then stopped again and another unknown

15  individual exited the back seat and entered the front passenger seat of the **SUBJECT**

16  **VEHICLE**. This subject was not observed entering the **SUBJECT VEHICLE** since

17  ORTIZ returned with the passengers and is believed to be one of six passengers, which

18  explains why one individual was seen exiting the **SUBJECT VEHICLE's** cargo area[14].

19   47.     At approximately 3:05 a.m., ORTIZ exited the parking lot in the

20  **SUBJECT VEHICLE** with the passenger.

21   48.     At approximately 5:24 a.m., the **SUBJECT VEHICLE** returned to the

22  hotel. ORTIZ exited the **SUBJECT VEHICLE** alone, returning a few minutes later to

23  the room where he had left the other individuals a few hours earlier.

24
25
26  [14] Based on an open-source search of the vehicle identification number (VIN) assigned to ORTIZ's 2019 Jeep
Cherokee, the model and trim level shows that the seating capacity of the vehicle is five passengers.
27  https://www.caranddriver.com/jeep/cherokee/specs/2019/jeep_cherokee_jeep-cherokee_2019/397920 (last visited
December 7, 2023).

AFFIDAVIT OF DAVID SPITZER - 14
USAO #2023R01258

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

49.     At approximately 10:08 a.m., ORTIZ left the room alone with one piece of luggage. After placing the luggage in the **SUBJECT VEHICLE**, ORTIZ returned to the hotel room a few minutes later.



50.     At approximately 10:18 a.m., ORTIZ and the other four individuals exited the room and returned to the **SUBJECT VEHICLE** in the parking lot. It appears as if the individuals were wearing different clothes from when they arrived earlier that night without any personal belongings. The four passengers entered the **SUBJECT VEHICLE** with all four entering the passenger compartment of the vehicle. ORTIZ then reentered the hotel and went directly to the front desk to check out. At approximately 10:22 a.m., ORTIZ returned to the **SUBJECT VEHICLE** and entered the front driver's seat. A minute later, the **SUBJECT VEHICLE** exited the parking lot.

AFFIDAVIT OF DAVID SPITZER - 15
USAO #2023R01258

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1
2
3
4
5
6
7
8



9
10
11
12
13
14
15
16



17
18
19
20
21
22
23
24
25
26
27

51.     After the **SUBJECT VEHICLE** departed the hotel parking lot, Border Patrol Intelligence Agents initiated mobile surveillance on the vehicle. Agents followed the **SUBJECT VEHICLE** southbound on Interstate 5 for several hours. At approximately 2:00 p.m., near Olympia, Washington, agents terminated surveillance as the **SUBJECT VEHICLE** continued southbound on Interstate 5 toward Oregon. The fact that the **SUBJECT VEHICLE** was continuing towards Oregon corroborates information provided during previous interviews with noncitizens related to this organization and their discussions with "Chuy" on TT1 that they are told they will be transported to Oregon.

AFFIDAVIT OF DAVID SPITZER - 16
USAO #2023R01258

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

52.     At approximately 7:00 p.m., an officer with the Independence, Oregon Police Department drove past several addresses associated with ORTIZ and Blanca ZAMARRIPA-Cruz, who is believed to be ORTIZ's spouse. The **SUBJECT VEHICLE** that was observed earlier that morning with the suspected noncitizens and followed by Border Patrol Intelligence Agents toward Oregon was observed by Officer Daniel Unverferth at a trailer, located at 151 Edwards Rd. S, #52 in Monmouth, Oregon. The **SUBJECT VEHICLE** was observed parked under a carport near another vehicle that is registered to ORTIZ's listed address on his driver license at 465 S 13th St., in Independence, Oregon.

### H.     Phone Toll Records for TT1

53.     Based on my experience, individuals communicate often with family and friends. A review of the phone toll data revealed that the most frequent person the user of TT1 communicates with is an individual with the telephone number (971) 240-1598. According to a search of law enforcement databases, that number belongs to Blanca ZAMARRIPA-Cruz. ZAMARRIPA is the registered owner of multiple Oregon plated vehicles, including the **SUBJECT VEHICLE**, which is shared ownership with ORTIZ. Based on my experience and speaking to Spanish speaking agents, I know that "Chuy" is a nickname for individuals named Jesus.

54.     A query of TT1 in law enforcement databases shows that the service provider for the phone number is Verizon Wireless. On July 19, 2023, I submitted an administrative subpoena to Verizon Wireless requesting subscriber and call information for TT1. Verizon responded to the subpoena with call detail records; however, Verizon informed me that the subscriber information for TT1 was held with TracFone Wireless. On August 2, 2023, I submitted a subpoena to TracFone Wireless for the subscriber information associated with TT1. On August 7, 2023, TracFone Wireless responded with responsive information that TT1 was a prepaid number registered to "Juan copy_2 Pablo" with an address of "No Address Provided" in Marysville, Washington. On November 29,

AFFIDAVIT OF DAVID SPITZER - 17
USAO #2023R01258

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

2023, I contacted TracFone Wireless via telephone and confirmed that TT1 was still active with the same subscriber information. TracFone confirmed that TT1 has been active since May 29, 2022, but while the subscriber information has changed slightly and different devices have been used, the account ID email address, juanpablo123@none.com, has been the same during that entire period.

55.     Based upon my training and experience, I know that the use of prepaid phones is a common practice within smuggling organizations, as it conceals the identity of the user thereby making it more difficult for law enforcement to identify members of the smuggling organization. Based on my experience and the fact that the account ID email address has not changed, I believe that ORTIZ has been the user of TT1 since May 2022.

**I.      Issuance of Warrant and Tracking of TT1**

56.     On December 29, 2023, the Honorable S. Kate Vaughan issued a search warrant and pen register and trap and trace for TT1 under case number: MJ23-626. That same day, Verizon began transmitting responsive data.

57.     On January 20, 2024, based on the GPS pings of TT1, I noticed that the phone was moving north from Oregon into Washington state. Border Patrol Intelligence Agent Manuel Robles and I initiated surveillance in order to observe ORTIZ and the **SUBJECT VEHICLE**. At approximately 11:05 p.m., I observed the **SUBJECT VEHICLE** parked in a garage associated with the Emerald Queen Casino near Tacoma, Washington. On January 21, 2024, at approximately 2:40 a.m., I observed ORTIZ enter the **SUBJECT VEHICLE** and exit the parking garage. I initiated mobile surveillance and followed the **SUBJECT VEHICLE** to a rest area near SeaTac, Washington. The **SUBJECT VEHICLE** remained at the rest area until approximately 4:00 a.m., when the vehicle began heading north toward Everett, Washington. Mobile surveillance was unable to be conducted due to a lack of manpower; however, based on GPS tracking of TT1, the device was in the area of Everett, Washington, at approximately 5:00 a.m. TT1 remained

AFFIDAVIT OF DAVID SPITZER - 18
USAO #2023R01258

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

within a 593-meter radius of 13709 Meridian Pl W in Everett, Washington, until approximately 5:24 a.m., when the device first pinged heading southbound on Interstate 5 from Everett, Washington.

58.     It should be noted that there were no calls or messages made from or to TT1 between 5:01 p.m. on January 20, 2024, and 3:47 a.m. on January 21, 2024, which is approximately the time that ORTIZ left the rest area and traveled north toward Everett, Washington. In my experience, human smugglers are working with other co-conspirators and wait until they are told that the undocumented noncitizens have successfully crossed the International Boundary into the United States from Canada. Based on this investigation, it is my belief that ORTIZ and other individuals are transporting and facilitating the travel of undocumented noncitizens across the International Boundary where they are transferred to ORTIZ in an area away from the border, such as Everett, Washington.

59.     At approximately 9:39 a.m., TT1 was tracked to Albany, Oregon, where it remained for approximately 15 minutes until it was observed traveling northbound towards Monmouth, Oregon, where the **SUBJECT VEHICLE** had been previously observed on November 6, 2023, as described above in paragraph 52. The continued GPS pings in Monmouth are approximately 300 ft. from the address associated to ORTIZ, which is well within the margin of error given by Verizon.

60.     On January 22, 2024, Border Patrol Intelligence Agents and I initiated surveillance in Everett, Washington, in order to observe ORTIZ in the area that TT1 was pinging the previous morning. At approximately 1:54 a.m., TT1 was pinging near the same rest area near SeaTac, Washington as the day before.

61.     At approximately 7:00 a.m., I was notified by Border Patrol Agents in Blaine Sector that an apprehension of two Mexican nationals was made near Sumas, Washington. At approximately 7:54 a.m., TT1 began moving away from the rest area

AFFIDAVIT OF DAVID SPITZER - 19
USAO #2023R01258

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

near SeaTac, Washington. The next ping of TT1 showed the device traveling southbound on Interstate 5 toward Oregon.

62.     Based on my experience and the timing of these pings, I believe that ORTIZ was waiting at the rest area for these two individuals to successfully cross the International Boundary into the United States from Canada before traveling up to the Everett, Washington area. Once the apprehensions were made, ORTIZ cancelled his plans of traveling up to Everett, Washington and turned back around and returned to Oregon. At 11:54 a.m., TT1 was, once again, pinging in the same area of Monmouth, Oregon.

63.     On January 23, 2024, at approximately 12:09 a.m., TT1 was pinged leaving the Emerald Queen Casino in Tacoma, Washington, and traveling north on Interstate 5 toward Everett, Washington. At approximately 12:55 a.m., TT1 was observed pinging in the same area of Everett, Washington near 13709 Meridian Pl W. The next ping of TT1 showed that the device was already traveling southbound on Interstate 5 toward Oregon.

64.     From my experience, it is common for human smugglers to adjust the times that people are smuggled into the United States immediately following an apprehension to avoid predictable patterns of illicit activity that can be easily detected by law enforcement. Based on my experience, this is a likely reason for why ORTIZ traveled up to the Seattle metropolitan area much earlier than he had the previous two days.

65.     On January 23, 2024, at approximately 10:54 p.m., a review of the data showed that TT1 was traveling southbound on Interstate 5 toward California. On January 24, 2024, TT1 traveled down to the Los Angeles metropolitan area before traveling back to his residence in Oregon, where he arrived just before 2:00 p.m. on January 25, 2024. In my experience, human smugglers transport the undocumented noncitizens to other areas of the country subsequent to their unlawful entry into the United States. Once the people are delivered, human smugglers are often paid in cash, which is subsequently transported in their vehicle to where they live.

AFFIDAVIT OF DAVID SPITZER - 20
USAO #2023R01258

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**J.     Issuance of Vehicle Tracking Warrant for the SUBJECT VEHICLE and Subsequent Surveillance**

66.     On January 26, 2024, the Honorable S. Kate Vaughan issued a GPS tracking warrant for the **SUBJECT VEHICLE** under case number MJ24-049.

67.     On January 31, 2024, at approximately 9:10 p.m., TT1 was pinging the area of the Emerald Queen Casino in Tacoma, Washington. At approximately 9:55 p.m., members of a surveillance team arrived at the Emerald Queen Casino. BPA-I Robles located the **SUBJECT VEHICLE** in the south parking garage, which is attached to the casino. At approximately 10:07 p.m., I successfully installed the court ordered GPS tracking device on the **SUBJECT VEHICLE**.

68.     At approximately 10:45 p.m., mobile surveillance was initiated as the **SUBJECT VEHICLE** departed the Emerald Queen Casino and traveled northbound on Interstate 5. At approximately 11:32 p.m., the **SUBJECT VEHICLE** exited the freeway at 128th Street in Everett, Washington. From that time until approximately 11:57 p.m., the **SUBJECT VEHICLE** was observed going through several parking lots, stopping for brief periods of time, and making U-turns for no apparent reason. During the surveillance, ORTIZ was only observed exiting the vehicle twice, once to go inside the convenience store at a gas station and once at the Motel 6. Agents were unable to determine if ORTIZ met with anyone at the Motel 6; however, nobody other than ORTIZ was observed entering the vehicle. At approximately 11:57 p.m., the **SUBJECT VEHICLE** was observed getting onto Interstate 5 and heading back south towards Seattle. After approximately another 15 minutes of following ORTIZ, surveillance was terminated.

69.     Based on my experience, it is common for smugglers of contraband to often use "heat checks" to determine if they are being followed by law enforcement before conducting their illicit activities. If smugglers believe they are being followed, these individuals will often abort their activities to avoid arrest. Once they determine that they

are not being followed, smugglers will continue to a predetermined location, where they will conduct the illicit activity. It should be noted that 128th Street in Everett is where the Quality Inn and Suites is located, where ORTIZ has been observed and believed to involved in human smuggling. Below is an illustration of the tracking of the **SUBJECT VEHICLE** on January 31, 2024, from when the vehicle exited the freeway on 128th Street to when he reentered the freeway a short time later and traveled back southbound on Interstate 5.



70.     Based on the GPS tracker data, the **SUBJECT VEHICLE** continued southbound on Interstate 5 until, once again, parking near the Emerald Queen Casino in Tacoma, Washington, at approximately 1:00 a.m. According to the tracker data, at approximately 1:53 a.m., the **SUBJECT VEHICLE** began moving and continued southbound on Interstate 5. At approximately 2:35 a.m., the tracker showed that the **SUBJECT VEHICLE** stopped at a rest area near Rochester, Washington. The **SUBJECT VEHICLE** remained stationary there until approximately 7:51 a.m., when the vehicle continued southbound on Interstate 5 towards Oregon. The **SUBJECT VEHICLE** made stops at the Santiam River rest area and a Love's Truck Stop at 10:29 a.m. and 10:44 a.m., respectively. The **SUBJECT VEHICLE** made several more stops

AFFIDAVIT OF DAVID SPITZER - 22
USAO #2023R01258

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

before the vehicle returned to the residence frequented by ORTIZ, located near 150 Edwards Rd S, Monmouth, Oregon, at approximately 1:53 p.m.

71.    It should be noted that all the data for TT1 was consistent with the GPS tracking data of the **SUBJECT VEHICLE**, which suggests ORTIZ is consistently in possession of TT1.

**K.    Suspected Smuggling Event Occurring on February 7, 2024**

72.    On February 7, 2024, at approximately 6:45 p.m., based on GPS tracking of the **SUBJECT VEHICLE**, I noticed that it was northbound on Interstate 5, just north of Salem, Oregon. At approximately 9:40 p.m., the GPS data showed that the **SUBJECT VEHICLE** had arrived at the Emerald Queen Casino in Tacoma, Washington, where ORTIZ and his vehicle have been observed prior to suspected human smuggling events, as discussed throughout this Affidavit.

73.    At approximately 10:21 p.m., based on GPS data, the **SUBJECT VEHICLE** departed the Emerald Queen Casino and traveled northbound toward Everett, Washington. At 11:16 p.m., the **SUBJECT VEHICLE** arrived at the Quality Inn and Suites in Everett, Washington. Both GPS data and surveillance video from the Quality Inn and Suites support these times.



AFFIDAVIT OF DAVID SPITZER - 23
USAO #2023R01258

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

74.     At the same time of the **SUBJECT VEHICLE's** arrival at the hotel, an individual is waiting in the lobby. According to an employee at the hotel, that individual was identified at check-in as Luis Ramirez-Capilla.

 

75.     A few minutes later, Ramirez was observed exiting the hotel and meeting with ORTIZ behind the **SUBJECT VEHICLE** in the parking lot. At approximately 11:20 p.m., a woman and three children, dressed in all black clothing, were observed walking from the **SUBJECT VEHICLE** and entering the hotel. Ramirez was holding one of the children and ORTIZ followed behind with no interaction with Ramirez or any of the other people. Based upon my experience, the clothing, ORTIZ's interaction with the individuals, and the circumstances of this event are highly indicative of human smuggling.

76.     As illustrated in the photos below, ORTIZ enters the elevator at approximately 11:20 p.m., with the group of people. At this point, ORTIZ is only observed with a backpack slung over his right shoulder. At approximately 11:35 p.m., ORTIZ is observed leaving the hotel alone with the backpack still slung over his right shoulder. Based upon my experience, human smugglers often drop off the people they have been hired to smuggle with family or other co-conspirators with little to no interaction with these people due to the fact that they have no prior relationship to these individuals. After the people are successfully brought to a predetermined location, the

AFFIDAVIT OF DAVID SPITZER - 24
USAO #2023R01258

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

smugglers are paid for their services, often in cash, and then the smuggler departs after his/her role in the process is complete.

 

77.    The **SUBJECT VEHICLE** was observed on hotel surveillance camera departing the Quality Inn and Suites at approximately 11:39 p.m. These times are all consistent with the GPS tracker installed on the **SUBJECT VEHICLE** and the location data provided by TT1. According to the GPS tracking data, the **SUBJECT VEHICLE** immediately entered Interstate 5 and traveled southbound toward Oregon. According to the data, ORTIZ made two stops along Interstate 5, including at a Taco Bell in Olympia, Washington and a 40-minute stop at a casino near Ridgefield, Washington, before arriving back at his residence in Monmouth, Oregon at approximately 4:44 a.m.

**L.    Suspected Smuggling Event Occurring on February 11, 2024**

78.    On February 11, 2024, at approximately 6:14 p.m., based on GPS tracking of the **SUBJECT VEHICLE**, I noticed that it was traveling northbound on Interstate 5. The **SUBJECT VEHICLE** continued northbound until it reached the area surrounding the Emerald Queen Casino in Tacoma, Washington, at approximately 8:57 p.m. At approximately 10:58 p.m., the **SUBJECT VEHICLE** began moving and continued northbound on Interstate 5. While in the past, the **SUBJECT VEHICLE** has continued northbound on Interstate 5 towards Everett, Washington, on this occasion, the **SUBJECT VEHICLE** went eastbound on Interstate 90 and then northbound on Interstate 405. In my

AFFIDAVIT OF DAVID SPITZER - 25
USAO #2023R01258

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

experience, smugglers often change their times, locations, and routes of travel to avoid detection and apprehension by law enforcement.

79.     After exiting Interstate 405, the **SUBJECT VEHICLE** turned westbound on NE 116th Street in Kirkland, Washington. According to the tracking data, while continuing westbound on NE Juanita Dr, the **SUBJECT VEHICLE** made a U-turn and then began traveling eastbound on NE Juanita Dr. As stated earlier, in my experience, smugglers of contraband often make evasive maneuvers in an attempt to identify whether law enforcement is following them.

80.     At approximately 11:55 p.m., the **SUBJECT VEHICLE** stopped at a Chevron gas station located at the corner of NE 116th Street and 98th Ave NE in Kirkland, Washington. It should be noted that the **SUBJECT VEHICLE** had previously passed this same intersection approximately seven minutes prior, which makes me believe that the U-turn mentioned in the previous paragraph was a deliberate attempt to identify if the vehicle was being followed by law enforcement.

81.     According to the GPS data, the **SUBJECT VEHICLE** was stationary for approximately one minute and 29 seconds, which, in my estimation, is not enough time to conduct any legitimate activity at a service station. Due to this ongoing investigation, a decision was made not to attempt to request camera footage at the service station; however, it is unknown what occurred during that stop. Since the vehicle returned to the freeway and didn't stop again until a Flying J service station near Olympia, Washington, and based on the information available during this investigation, it is unlikely that ORTIZ would have driven up to Kirkland, Washington, and back to southern Washington, an area the vehicle was at nearly five hours prior for no reason.

82.     After a brief stop at a rest area near Ridgefield, Washington, the **SUBJECT VEHICLE** continued southbound on Interstate 5 until it reached his residence in Monmouth, Oregon at approximately 4:33 a.m. on February 12th, 2024.

AFFIDAVIT OF DAVID SPITZER - 26
USAO #2023R01258

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1

2

**M.      Smuggling Event Occurring on February 25, 2024**

3       83.     On February 25, 2024, at approximately 4:20 p.m., based on tracker data, I

4  noticed that the **SUBJECT VEHICLE** was northbound on Interstate 5 near Salem,

5  Oregon. Agents continued to monitor the tracker data as the **SUBJECT VEHICLE**

6  continued northbound from the Oregon/Washington state line at approximately 5:09 p.m.

7  At approximately 7:35 p.m., according to the tracker data, the **SUBJECT VEHICLE**

8  arrived at the Emerald Queen Casino. It is suspected that ORTIZ stops there while

9  someone else picks up the undocumented noncitizens from near the United States/Canada

10  International Boundary prior to transferring the people to ORTIZ, who then transports

11  them in furtherance of their unlawful entry to various locations throughout the United

States.

12       84.     BPA-I Robles was able to identify that it was, in fact, ORTIZ inside the

13  casino. At approximately 10:30 p.m., ORTIZ departed the casino, entered the **SUBJECT**

14  **VEHICLE**, and began heading north on Interstate 5 towards Seattle, Washington. Agents

15  began mobile physical surveillance of the **SUBJECT VEHICLE**, while also using the

16  tracking device in order to maintain a distance as to not alert ORTIZ that he was being

17  surveilled. At approximately 10:47 p.m., the **SUBJECT VEHICLE** exited Interstate 5

18  near the Southcenter Mall in Seattle, Washington. After exiting the freeway, the

19  **SUBJECT VEHICLE** began traveling southbound on Southcenter Parkway for less than

20  a minute before making a U-turn and traveling back northbound from the direction it had

21  just come. Based on my experience and previous times conducting surveillance on the

22  **SUBJECT VEHICLE**, I believe ORTIZ conducts counter surveillance in order to

23  identify if he is being followed by law enforcement. Agents used the tracker to monitor

24  the location of the **SUBJECT VEHICLE**.

25       85.     After traveling for several minutes around the boundary of the mall, the

26  **SUBJECT VEHICLE** entered the on-ramp and began traveling northbound on Interstate

27  405. Based on my knowledge of the area, the most direct route for ORTIZ to have gotten

on Interstate 405 would have been to take the next exit off of Interstate 5 instead of exiting at the Southcenter Mall. I believe ORTIZ took this route as a counter surveillance tactic since there are not many cars in and around the mall at that time of night.

86. Agents continued following the **SUBJECT VEHICLE** on I-405 for approximately the next twenty minutes until it exited onto NE 116th Street near Kirkland, Washington. After exiting the freeway, the **SUBJECT VEHICLE** turned left onto NE 116th Street and continued west. Agents followed the **SUBJECT VEHICLE** at a distance due to the lack of vehicular traffic on the road. Just past the intersection where NE 116th Street turned into NE Juanita Drive, agents observed the **SUBJECT VEHICLE** make a left hand turn into a parking lot for the Juanita Beach Park. It should be noted that this is the same area the **SUBJECT VEHICLE** traveled to on February 11, 2024, where ORTIZ is suspected of picking up undocumented noncitizens at a gas station that is less than one mile from the Juanita Beach Park lot.

87. At approximately 11:13 p.m., agents observed the **SUBJECT VEHICLE** park next to a white Buick sports utility vehicle (SUV). Agents observed ORTIZ standing outside the driver's side door of the **SUBJECT VEHICLE**. Agents also observed all four doors, to include the rear cargo area, of the **SUBJECT VEHICLE** open with multiple people placing bags in the cargo area and boarding the **SUBJECT VEHICLE**. The **SUBJECT VEHICLE** was not there for more than approximately two minutes before agents observed the white Buick SUV leaving the area with the **SUBJECT VEHICLE** following closely behind towards the exit of the park off NE Juanita Dr.

88. At approximately 11:16 p.m., agents observed both the white Buick SUV and the **SUBJECT VEHICLE** turning eastbound on NE Juanita Dr. The **SUBJECT VEHICLE** continued to travel back towards Interstate 405, the same direction it had come from only minutes earlier. The white Buick SUV turned left turn onto 98th Ave NE. Agents followed the white Buick SUV and relayed via service radio that the vehicle bore Washington license plate CBN0570. The Buick SUV continued onto 98th Ave NE

AFFIDAVIT OF DAVID SPITZER - 28
USAO #2023R01258

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

and quickly turned into a shopping mall located at 11844 98th Ave NE and parked near Envy Nails. While waiting for the vehicle to depart again, SA Toby Ledgerwood conducted records checks on the license plate and relayed to agents that the vehicle returned to a 2022 Buick Enclave and was a Hertz rental car out of SeaTac, Washington.

89.     Moments later, agents observed the Buick Enclave pulling out of its parking spot and leaving the parking lot. Agents observed the Buick Enclave make making several turns and once again passed the Juanita Beach Park. Agents followed the white Buick Enclave on Juanita Dr NE for several minutes until it turned right onto NE 143rd St and another quick right onto 73rd Ave NE. At approximately 11:30 p.m., agents observed the Buick Enclave parked along a fence line off NE 142nd Pl, which is part of the Inglenook Court Apartments, located at 14220 Juanita Dr NE in Kirkland, Washington. Agents took note of other vehicle license plates in the immediate area of the rental vehicle in order to associate with potential co-conspirators.

90.     While agents were conducting surveillance on the Buick Enclave, I was following the **SUBJECT VEHICLE** at a distance and using the vehicle tracker. The **SUBJECT VEHICLE** traveled directly to the Interstate 405 on ramp and began traveling southbound. The **SUBJECT VEHICLE** continued south on I-405 until reaching the I-5 interchange, where it began traveling south onto the I-5 towards Tacoma, Washington. The **SUBJECT VEHICLE** continued south on I-5 until exiting the freeway and making a stop at the Love's Gas Station, located at 1276 Rush Rd in Napavine, Washington, at approximately 12:54 a.m. I initiated static surveillance from across the street and observed only ORTIZ exit the vehicle at this location. Based on my experience, it is common for human smugglers to order the undocumented noncitizens to stay in the vehicle as to not arouse suspicion of the general public or law enforcement. Oftentimes, the noncitizens are covered in mud or wet from crossing the border unlawfully, especially during this time of year in Washington.

AFFIDAVIT OF DAVID SPITZER - 29
USAO #2023R01258

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

91.     At approximately 1:06 a.m., the **SUBJECT VEHICLE** left the Love's Gas Station and got back onto I-5 heading south towards Oregon. The **SUBJECT VEHICLE** continued south on I-5 until crossing into the state of Oregon at approximately 2:11 a.m., where it remained on I-5 until exiting at approximately 2:53 a.m., near Salem, Oregon. The **SUBJECT VEHICLE** continued through Salem, Oregon, for approximately 20 minutes before arriving at the residence the **SUBJECT VEHICLE** is most often observed at via tracker data, located at 151 Edwards Rd S in Monmouth, Oregon. While the vehicle went through back roads and small towns outside of Salem, I made the decision to not continue following the vehicle and to use the tracking device as to not be observed by ORTIZ. According to the tracker data, the **SUBJECT VEHICLE** was at the residence for approximately seven minutes before leaving and arriving at a parking lot near an Oregon State Credit Union branch in Monmouth, Oregon, at approximately 3:30 a.m. Based on the time, it is suspected the ORTIZ used the ATM at that location due to the fact that no other businesses, including the bank, in that parking lot would be open at that time[15].

92.     After a short period of time there, the **SUBJECT VEHICLE** traveled to the Independence Hotel, where the **SUBJECT VEHICLE** arrived at approximately 3:45 a.m. The **SUBJECT VEHICLE** remained there for the rest of the evening.

**N.     Trip to California and Seizure of Proceeds**

93.     On February 26, 2024, at approximately 12:42 p.m., according to the tracking information, the **SUBJECT VEHICLE** departed ORTIZ's residence in Monmouth, Oregon, and began traveling toward Salem, Oregon. The **SUBJECT**

---

[15] In several previous affidavits related to this investigation, based on my training and experience, I believed that the purpose for ORTIZ to go to the ATM was to take out cash to pay for expenses related to the illicit activity. While this is an accurate representation based on previous investigations, a review of Oregon State Credit Union records show that ORTIZ deposited $500 in cash in the early morning hours on February 26, 2024, hours after picking up the suspected undocumented noncitizens in Kirkland, Washington. Records also show that ORTIZ made another $200 deposit later in that same morning on February 26, 2024. While the source of these funds is unknown, based on my experience, these deposits may be payment from the noncitizens for their smuggling across the border and/or transportation in furtherance of their unlawful entry.

**VEHICLE** then began traveling southbound on Interstate 5 toward California. Along the way, the **SUBJECT VEHICLE** made several stops at various rest areas and gas stations before reaching Salinas, California. Based on the tracker data, the **SUBJECT VEHICLE** stopped at approximately 11:22 p.m., at a residence located at 1153 Trivoli Way in Salinas, California. The **SUBJECT VEHICLE** was stopped at that residence for approximately 32 minutes before departing at approximately 11:54 p.m. Less than ten minutes later, the **SUBJECT VEHICLE** stopped at a gas station in Salinas, California, and then proceeded to travel back on the freeway toward Oregon. On its way back from Oregon, the **SUBJECT VEHICLE** stopped at a rest area for approximately two and a half hours near Red Bluff, California, before continuing on towards Oregon. In my experience, all of this activity is indicative of human smuggling, including a short stop at a residence in California the day after being suspected of picking up undocumented noncitizens. Based on my experience, as previously discussed in this Affidavit, human smugglers oftentimes are paid in cash after dropping off the noncitizens with family members or other co-conspirators and then transport that cash in their vehicle back to where they live.

94.     On February 27, 2024, at approximately 10:31 a.m., officer Adamson with the Medford Area Drug and Gang Enforcement (MADGE) task force[16] activated his overhead lights and conducted a stop on the **SUBJECT VEHICLE** for state of Oregon traffic violations. Investigators were aware of the September 2022 vehicle stop in Nebraska that resulted in the seizure of $13,400 concealed within the vehicle occupied by ORTIZ.

95.     ORTIZ, driving the **SUBJECT VEHICLE**, yielded to officers in the parking lot of Seven Feathers Casino located at 146 Chief Miwaleta Ln in Canyonville,

---

[16] MADGE consists of five different law enforcement agencies: Medford Police Department, Jackson County Sheriff's Office, Jackson County Community Corrections, Federal Bureau of Investigations, Homeland Security Investigations, and the Jackson County District Attorney's Office (https://www.medfordoregon.gov/Government/Departments/Police/MADGEIMET-Task-Force).

AFFIDAVIT OF DAVID SPITZER - 31
USAO #2023R01258

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Oregon. Medford Police Department (MPD) Detective Martin, a native Spanish speaker, assisted HSI SA Michaud with interview of ORTIZ over the telephone. ORTIZ consented to search of the **SUBJECT VEHICLE** and signed a consent to search form for the vehicle. During search of the **SUBJECT VEHICLE**, investigators located $10,500 in U.S. currency concealed inside the fabric of the rear passenger seat.

 

96.     ORTIZ stated that he works in construction and the money is from casino winnings. When SA Michaud asked ORTIZ why the money was hidden inside the fabric of his rear passenger seat, ORTIZ stated it is because he was cautious of the money being stolen. SA Michaud asked ORTIZ where he was coming from, and ORTIZ stated he was coming from Salinas, California, and was on his way home to Independence, Oregon. When asked why he was in Salinas, ORTIZ stated he drove a woman and her child to Salinas. ORTIZ stated the woman and child were just friends and not family. ORTIZ told investigators that he did not get paid for driving the woman and child, and he simply drove them as a favor. MADGE K9 Officer Tucker conducted a K9 search, during which K9 Bodie alerted to the odor of narcotics on the U.S. currency. Based on all these factors, SA Michaud seized the currency and provided ORTIZ with a MPD property receipt for the seized currency.

97.     ORTIZ and the **SUBJECT VEHICLE** were released from the vehicle stop at approximately 11:41 a.m. According to the GPS tracking data, the **SUBJECT VEHICLE** returned to the residence in Monmouth, Oregon, at approximately 2:23 p.m.

AFFIDAVIT OF DAVID SPITZER - 32
USAO #2023R01258

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**O.     Hertz Subpoena Return and Identification of Potential Co-Conspirator**

98.     On February 26, 2024, I submitted an administrative subpoena to Hertz Corporation for information related to the rental of the Buick Enclave, bearing Washington license plate CBN0570 encountered the previous evening.

99.     On February 29, 2024, I received the subpoena return from the Hertz Corporation. According to Hertz, the vehicle was rented by Jesus TORRES-Lopez with an associated address of 130 Daisy St NE in Royal City, Washington. The vehicle was rented on February 25, 2024, at 6:35 p.m. and returned the next day (February 26, 2024) at 6:38 p.m. The rental agreement listed a phone number of (206) 295-8090.

100.    Based on a review of law enforcement databases, a vehicle bearing Washington license plate CBN0570 was observed at approximately 9:18 p.m. in close proximity to the United States/Canada International boundary and in an area known to law enforcement as a high traffic area for undocumented noncitizens to be unlawfully brought into the United States. Based on my knowledge of the area, it would take just under two hours from the area near the International boundary to Kirkland, Washington. Based on the timing of TORRES' trip and my knowledge of this organization, it is likely that TORRES picked up a group of noncitizens subsequent to their unlawful entry into the United States, transferred those people to ORTIZ in Kirkland, WA, who then furthered their unlawful entry by transporting them to California, and then was subsequently paid for committing the Target Offenses.

101.    A review of the plates gathered at the apartment complex in Kirkland, Washington, after the human smuggling event revealed a 2020 black Cadillac CTS bearing Washington temporary tag A6996499. The registered owner of that vehicle is Jesus TORRES-Lopez with the same associated address in Royal City, Washington. Based on this information, I believe that TORRES may reside at the apartment complex in Kirkland, Washington. In speaking with Border Patrol Agents assigned to the Blaine Sector area of responsibility, agents assigned to the Sumas area on January 31, 2024, remember observing a black Cadillac CTS with a Washington temporary tag driving through the area. It was unknown at that time if the vehicle picked up any undocumented

AFFIDAVIT OF DAVID SPITZER - 33
USAO #2023R01258

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

noncitizens near the United States/Canada International boundary; however, it matches the pattern in the fact that ORTIZ traveled up to the Everett, Washington area on that same evening. However, it is possible that he aborted his smuggling attempt due to the possibly of law enforcement in the area.

### P.  Cell Site Analysis of TORRES and ORTIZ Locations During Suspected Smuggling Events

102.   On January 31, 2024, according to historical cell site data, at approximately 8:00 p.m., TORRES began traveling from the Kirkland, Washington area towards the United States/Canada International Boundary. Earlier in the day, TORRES's phone was pinging in the area of Royal City, WA, which is the city listed as his permanent address on his Washington state driver license. Between approximately 9:45 p.m. and 10:15 p.m., TORRES's phone was pinging in a high traffic area for human smuggling near the United States/Canada International Boundary. As previously discussed above, Border Patrol Agents assigned to his area recall observing a vehicle registered to TORRES in the area on this date. After leaving the area near the border, the cell site data for TORRES's phone showed a direct route to Everett, Washington. Cell site data, on January 31, 2024, at approximately 11:33 p.m., places TORRES's phone in the same area as ORTIZ's vehicle tracker data, as shown in the illustrations below. Based on the tracking data of ORTIZ's vehicle, he exited Interstate 5 at 128th Street SW in Everett, Washington, at approximately 11:32 p.m. and was in that area until approximately 11:57 p.m. when ORTIZ got back onto Interstate 5 and headed south towards Oregon. In comparison, when reviewing the cell site data for TORRES's phone, TORRES is in the area of 128th Street SW in Everett, Washington, at approximately 11:32 p.m., and exits the area via Interstate 5 between 11:40 p.m. and 11:52 p.m.

103.   Based on this information, it is possible that undocumented noncitizens were transferred to ORTIZ or based on law enforcement's presence in the area, the attempted human smuggling event was thwarted. As discussed earlier, ORTIZ's driving behavior was indicative of human smuggling activity occurring; however, no people were observed exchanged between the two vehicles. Based on TORRES's trip to the border

AFFIDAVIT OF DAVID SPITZER - 34
USAO #2023R01258

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

and the subsequent co-location of TORRES and ORTIZ in Everett, Washington, later that evening, it is suspected that that TORRES and ORTIZ were involved in conspiring to smuggle undocumented noncitizens.



104.    A review of historical cell site data for TORRES on February 11, 2024, shows his phone pinging in a high traffic area for human smuggling activity near the United States/Canada International Boundary between approximately 9:57 p.m. and 10:12 p.m.

AFFIDAVIT OF DAVID SPITZER - 35
USAO #2023R01258

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970



105.    As previously discussed above, based on tracker data of ORTIZ's vehicle, it is believed that an exchange of people may have occurred around 11:55 p.m. at a Chevon near the intersection of 98th Ave NE and 116th Street. After leaving the area near the border, the cell site data for TORRES's phone showed a direct route to Kirkland, Washington. Cell site data, on February 11, 2024, at approximately 11:52 p.m., places TORRES's phone in the same area as ORTIZ's vehicle tracker data near the Chevron a few minutes prior to the suspected transfer of undocumented noncitizens, as shown in the illustrations below.



AFFIDAVIT OF DAVID SPITZER - 36
USAO #2023R01258

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970



106.    On February 25, 2024, based on information received via subpoena from Hertz, TORRES was observed on surveillance video renting a vehicle from Hertz at the Seatle-Tacoma International Airport (SeaTac) at approximately 6:35 p.m.



107.    Multiple investigators familiar with this case have reviewed the surveillance video associated with the above rental as well as the Washington state driver license associated to TORRES and each concluded that the individual depicted in the surveillance video is TORRES.

108.    After reviewing cell site data, it appears that after departing the SeaTac Rental Car Facility, TORRES drove straight toward the United States/Canada International Boundary, where the cell site data places his device between 9:18 p.m. and 9:36 p.m.

AFFIDAVIT OF DAVID SPITZER - 37
USAO #2023R01258

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

109.    After leaving the area surrounding the United States/Canada International Boundary, according to cell site data, TORRES travels directly towards Kirkland, Washington. At approximately 11:07 p.m., TORRES's device is pinging in the area of the Juanita Beach Park, where, a few minutes later, investigators observed the transfer of suspected undocumented noncitizens from the vehicle rented by TORRES to ORTIZ, as discussed above in paragraphs 84 – 93.

**Q.    Arrest of Jesus ORTIZ-Plata and Juan CUELLAR-Medina and the Seizure of SUBJECT VEHICLE on May 23, 2024**

110.    On May 23, 2024, at approximately 5:30 a.m., I reviewed court authorized GPS phone ping data and GPS tracking data for ORTIZ-Plata's **SUBJECT VEHICLE**, which both indicated that ORTIZ-Plata was traveling north from the Portland, Oregon area towards Seattle, Washington. As part of the investigation into ORTIZ-Plata, agents believed that ORTIZ-Plata frequently traveled from Oregon to various locations in the greater Seattle area and was believed to transport undocumented noncitizens to locations in Oregon and California.

111.    At approximately 9:45 a.m., agents established surveillance of ORTIZ-Plata's **SUBJECT VEHICLE** on Interstate 5 near Lynnwood, Washington. Agents maintained surveillance of the Cherokee, with assistance from the Bellingham Air and Marine (AMO) branch, as the vehicle exited I-5 in Everett, Washington. Agents

AFFIDAVIT OF DAVID SPITZER - 38
USAO #2023R01258

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

maintained surveillance of the Cherokee as it drove into the parking lot of an apartment complex, located at 120 SE Everett Mall Way in Everett, Washington. Agents had previously identified this location as an area frequented by ORTIZ-Plata, based on GPS tracking data. Agents suspected that this area is a location that ORTIZ-Plata utilizes to pick up undocumented noncitizens prior to their transportation in furtherance of their unlawful entry into the United States.

112.    Shortly after the Cherokee arrived and parked at the apartment complex, Border Patrol Agent Gonzalez observed ORTIZ-Plata exit the Cherokee and walk into an apartment, later identified as apartment number 611.

113.    At approximately 10:25 am, Border Patrol Agent Marroquin observed ORTIZ-Plata and three other male subjects, walking from the direction of Apartment 611. Border Patrol Agent Gonzalez saw all four subjects get into the Cherokee with ORTIZ-Plata as the driver of the vehicle. Agents immediately detained all four subjects, who were all seated in the vehicle, pending an investigation into suspected human smuggling.

114.    Border Patrol Agent Marroquin and Border Patrol Agent Singh questioned the three passengers of the Cherokee as to their citizenship and nationality. The three subjects were identified as E.Z.C., D.Z.C., and A.P.M. Agents Marroquin and Singh determined all three subjects to be undocumented noncitizens and unlawfully present in the United States. Border Patrol Agent Gonzalez and I subsequently informed ORTIZ-Plata he was under arrest for suspicion of alien smuggling and read ORTIZ-Plata his *Miranda* rights in the Spanish language. Agents did not question ORTIZ-Plata further at that time.

115.    During a search incident to arrest of ORIZ-Plata, BPA-I Kirby located a cellular telephone in his left front pocket and another cellular telephone in his right front pocket.

116.    Following the detention of the subjects in the **SUBJECT VEHICLE**, agents conducted a knock-and-talk on Apartment 611. Upon knocking on the door, Juan

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

CUELLAR-Medina opened the door to the apartment. CUELLAR-Medina told agents he was the only remaining occupant of apartment and consented to a search of the residence. Agents conducted a search of apartment and confirmed CUELLAR-Medina had been the only remaining occupant. BPA-I Robles asked CUELLAR-Medina if he had any identification documents and any more cellular devices in the residence. CUELLAR-Medina was observed by BPA-I Robles retrieving his wallet, apartment keys, and a cellular telephone from the top of the dresser in his bedroom of the apartment.

117.   CUELLAR-Medina was subsequently placed under arrest for suspicion of alien smuggling and read his *Miranda* rights in Spanish. CUELLAR-Medina acknowledged that he understood his rights. Agents did not question CUELLAR-Medina further at that time.

118.   During a search incident to arrest of CUELLAR-Medina, agents found another cellular telephone in the front right pocket of his shorts.

119.   ORTIZ-Plata, CUELLAR-Medina, and the three passengers were transported to Ferndale, Washington, for further questioning.

120.   The **SUBJECT VEHICLE** was seized for its involvement in the Target Offenses is currently located at the Bellingham Border Patrol Station, located at 1431 Sunset Avenue, Ferndale, Washington 98248.

121.   Border Patrol Agents subsequently interviewed D.Z.C in the Spanish language. He explained that he left his home in Honduras in 2017 or 2018 and that he entered the United States illegally and does not have any documents that would permit him to remain in the United States lawfully. He stated he had recently been living and working in Canada, but decided to return to the United States with his brother, E.Z.C. About three days before his arrest, he and E.Z.C., had flown to Vancouver, British Columbia, in order to be smuggled back to Portland, Oregon.

122.   D.Z.C and his brother had arranged to each pay $4000 to an unknown smuggler to take them to Portland, Oregon. On May 22, 2024, at approximately 10:00

AFFIDAVIT OF DAVID SPITZER - 40
USAO #2023R01258

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

p.m., while still in Canada, an unknown Hispanic male picked him and his brother up from a bus stop and drove them to a train station. Once at the train station, a third man, the man who was also arrested with him, was waiting for him. The Hispanic male told them to climb onboard the train and hide in the natural voids within the rail cars of the freight train. D.Z.C. said that they rode the train for approximately two hours before they got off and were picked up by an unknown person and driven for approximately 30 minutes before arriving at an apartment. D.Z.C. said that they arrived at the apartment at approximately 2:00 a.m. and stayed at that location until they were arrested that morning. D.Z.C. said that during his stay at the apartment, the man who picked them up did not provide them with food or water.

123.    During the interview, in an effort to identify ORTIZ-Plata, D.Z.C was shown a 6-pack photographic lineup but was unable to identify anyone. Later in the interview, D.Z.C. was subsequently shown another 6-pack photographic lineup in an effort to identify CUELLAR-Medina. From this second photographic lineup, D.Z.C. was able to positively identify picture #5, which depicts Juan Pablo CUELLAR-Medina. D.Z.C. stated that CUELLAR-Medina was the person that picked all three of them up after they got off the freight train and drove them to the apartment.

124.    Border Patrol Agents conducted an interview with E.Z.C. in the Spanish language. He explained that he has been living in Calgary, Canada, for the past four months with his brother D.Z.E., and had both decided to return to Portland, Oregon. According to E.Z.C. he and his brother took a bus to Vancouver, British Columbia, and made arrangements with an unknown smuggler to be taken to Portland, Oregon, for $2000 each.

125.    E.Z.C. explained that earlier that day, at around midnight, an unknown Hispanic or Colombian male picked him and his brother up from a hotel and drove them to a place in Vancouver, Canada, where they were told to get on a train. Once at the location of the train, a third male, the male who was arrested with him, was also at the

location waiting. The three men were instructed to climb and hide in the natural voids within the railroad cars of the freight train. They rode the train for approximately three hours before they got off and were picked up by an unknown person. Once inside the vehicle, they traveled for about thirty minutes before arriving at an apartment. They stayed there until they were arrested. During the time they were at the apartment, the person did not provide them with food or water. E.Z.C was unable to identify CUELLAR-Medina or ORTIZ-Plata from the 6-pack photographic line ups.

126.     Border Patrol Agents interviewed A.P.M. in the Hindi language. A.P.M. explained that he left India around 15 days ago and flew into Toronto, Canada. Once he was in Toronto, he decided to travel to the United States. A person from his village put him in contact with a person who could facilitate his travel into the United States illegally. A.P.M. claimed that he did not pay or know how much he was going to pay for his illegal entry. A.P.M. said that he arrived in Vancouver five days before his arrest and took a taxi from the hotel to a train station where he claimed to have met an individual in a white vehicle who drove him to the border for his illegal crossing. He said that he was directed to walk across the border to a waiting vehicle. Once inside the vehicle, he was driven to a house where the three remained for the night. On the morning of his arrest, he was directed to go to a vehicle parked outside. A.P.M. was unable to identify CUELLAR-Medina or ORTIZ-Plata from the 6-pack photographic line ups.

**R.     Indictment of Jesus ORTIZ Plata and Juan CUELLAR-Medina**

127.     On May 29, 2024, a Grand Jury in the Western District of Washington charged Jesus ORTIZ-Plata and Juan CUELLAR-Medina, in a one-count indictment alleging the offense of Conspiracy to Transport and Harbor Certain Aliens for Proft, in violation of Title 8, United States Code, Sections 1324(a)(1)(A)(ii), (a)(2)(B)(ii), and (a)(1)(A)(v)(I).

AFFIDAVIT OF DAVID SPITZER - 42
USAO #2023R01258

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**TECHNICAL TERMS**

128.    Based on my training and experience, I use the following technical terms to convey the following meanings:

a.    *Wireless telephone*: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.    *Digital camera*: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c.    *Portable media player*: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.    *GPS*: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the

AFFIDAVIT OF DAVID SPITZER - 43
USAO #2023R01258

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.      *PDA*: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.      *Tablet*: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, which is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g.      *IP Address*: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

h.      *Internet*: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

i.      *Electronic Storage media*: Electronic Storage media is any physical object upon which data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

AFFIDAVIT OF DAVID SPITZER - 44
USAO #2023R01258

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

2

129.     As described above and in Attachment B, this application seeks permission

3

to search for evidence, fruits, and/or instrumentalities that might be found in the

4

**SUBJECT VEHICLE**, in whatever form they are found. One form in which the

5

evidence, fruits, and/or instrumentalities might be found is data stored on digital devices[17]

6

such as computer hard drives or other electronic storage media.[18] Thus, the warrant

7

applied for would authorize the seizure of digital devices or other electronic storage

8

media or, potentially, the copying of electronically stored information from digital

9

devices or other electronic storage media, all under Rule 41(e)(2)(B).

10

130.     *Probable cause.* Based upon my review of the evidence gathered in this

11

investigation, my review of data and records, information received from other agents and

12

computer forensics examiners, and my training and experience, I submit that if a digital

13

device or other electronic storage media is found in the **SUBJECT VEHICLE**, there is

14

probable cause to believe that evidence, fruits, and/or instrumentalities of the Target

15

Offenses will be stored on those digital devices or other electronic storage media. As

16

detailed herein, I believe that ORTIZ is using multiple different digital devices to

17

coordinate with other co-conspirators. There is, therefore, probable cause to believe that

18

evidence, fruits, and/or instrumentalities of the Target Offenses exits and will be found

19

on digital devices or other electronic storage media in the **SUBJECT VEHICLE** for at

20

least the following reasons:

21

22

23

---

24

[17] "Digital device" includes any device capable of processing and/or storing data in electronic form, including, but not limited to: central processing units, laptop, desktop, notebook or tablet computers, computer servers, peripheral input/output devices such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media, related communications devices such as modems, routers and switches, and electronic/digital security devices, wireless communication devices such as mobile or cellular telephones and telephone paging devices, personal data assistants ("PDAs"), iPods/iPads, Blackberries, digital cameras, digital gaming devices, global positioning satellite devices (GPS), or portable media players.

25

26

[18] Electronic Storage media is any physical object upon which electronically stored information can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

27

a.      Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be preserved (and consequently also then recovered) for months or even years after they have been downloaded onto a storage medium, deleted, or accessed or viewed via the Internet. Electronic files downloaded to a digital device or other electronic storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a digital device or other electronic storage media, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.      Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be preserved (and consequently also then recovered) for months or even years after they have been downloaded onto a storage medium, deleted, or accessed or viewed via the Internet. Electronic files downloaded to a digital device or other electronic storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a digital device or other electronic storage media, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

c.      Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be preserved (and consequently also then recovered) for months or even years after they have been downloaded onto a storage medium, deleted, or accessed or viewed via the Internet. Electronic files downloaded to a digital device or other electronic storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a digital device or other electronic storage media, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

d.      Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

131.   *Forensic evidence*. As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how digital devices or other electronic storage media were used, the purpose of their use, who used them, and when. There is probable cause to believe that this

AFFIDAVIT OF DAVID SPITZER - 46
USAO #2023R01258

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

forensic electronic evidence will be on any digital devices or other electronic storage media located in the **SUBJECT VEHICLE** because:

a.      Stored data can provide evidence of a file that was once on the digital device or other electronic storage media but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the digital device or other electronic storage media that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the history of connections to other computers, the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the digital device or other electronic storage media was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b.      As explained herein, information stored within a digital device and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a digital device or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the device or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the device was remotely accessed, thus inculpating or exculpating the device owner and/or others with direct physical access to the computer. Further, device and storage media activity can indicate how and when the device or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of digital device or electronic storage media access, use, and events relating to the crime under investigation.[19] Additionally, some information stored within a digital device or

---

[19] For example, if the examination of a computer shows that: a) at 11:00am, someone using the computer used an internet browser to log into a bank account in the name of John Doe; b) at 11:02am the internet browser was used to download child pornography; and c) at 11:05 am the internet browser was used to log into a social media account in the name of John Doe, an investigator may reasonably draw an inference that John Doe downloaded child pornography.

AFFIDAVIT OF DAVID SPITZER - 47
USAO #2023R01258

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a digital device may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the digital device user. Last, information stored within a digital device may provide relevant insight into the device user's state of mind as it relates to the offense under investigation. For example, information within the digital device may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

   c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

   d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

   e. Further, in finding evidence of how a digital device or other electronic storage media was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

## BACKGROUND REGARDING SMUGGLING ORGANIZATIONS

132. Based on my training, education, experience, and discussions with other federal agents, I know:

133. That smugglers of undocumented noncitizens keep records of smuggling transactions and activities within ready access, such as in storage areas or vehicles, and conceal such items from law enforcement authorities; also, that undocumented noncitizens may be moved and transported, but documentary records and ledgers remain;

AFFIDAVIT OF DAVID SPITZER - 48
USAO #2023R01258

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

134.    That smugglers of undocumented noncitizens maintain various amounts of currency within ready access in order to finance their ongoing illegal activities, as well as using the currency to transporters, bills, acquire assets, and make purchases;

135.    That undocumented noncitizen smuggling transaction records, customer lists, financial statements, real estate documents and other evidence of financial transactions relating to obtaining, transferring, secreting or spending various sums of money made from engaging in undocumented noncitizen smuggling activities are often contained in their vehicles;

136.    That smugglers of undocumented noncitizens often amass large proceeds and have bank accounts, records and receipts, vehicle rental agreements for storage facilities, records of mail services and that such items may be secured within their vehicles for easy access;

137.    That smugglers and their associates who smuggle undocumented noncitizens into the United States will have maps showing smuggling routes, receipts showing travels to source countries, receipts pertaining to the purchase and registration of load vehicles, receipts showing the purchase of items commonly used by smugglers such as portable radios, cellular phones, and other equipment used for transporting large numbers of undocumented noncitizens. These individuals may possess these purchased items in their vehicles;

138.    The individuals in or about the areas to the searched often attempt to conceal property subject to seizure in their vehicles.

**DIGITAL DEVICES AS INSTRUMENTALITIES OF THE CRIMES**

139.    Through my training and experience, as well as the training and experience of other law enforcement officers participating in this investigation, I know that smugglers commonly use cellular telephones to communicate with their associates to facilitate the commission of criminal enterprise. Further, as detailed below, cellular telephones may contain electronically stored data on, or within the cellular handset,

AFFIDAVIT OF DAVID SPITZER - 49
USAO #2023R01258

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

including, but not limited to: contact names and numbers of coconspirators, call details including call history, electronic mail (e-mail) messages, text messages and/or activity. All this information can be used to identify and locate undocumented noncitizen trafficking associates and organizational leaders, to identify methods of operation of the Transnational Criminal Organizations (TCO), and to corroborate other evidence obtained during the course of investigation.

140.    Noncitizen smugglers and traffickers often maintain records reflecting names addresses, vehicles, and/or telephone numbers of associates involved in the overall smuggling conspiracy, as well as the names, photographs, and/or other identifying information of the noncitizens smuggled. Noncitizen smugglers and traffickers commonly maintain this information in books or papers as well as in cellular telephones and other electronic devices. Furthermore, noncitizen smugglers and those smuggled sometimes take, or cause to taken, photographs and/or video recordings of themselves, and/or their associates.

141.    The assigned number to the cellular telephone (known as the mobile directory number or MDN), and the identifying telephone serial number (Electronic Serial Number, or ESN), (Mobile Identification Number, or MIN), (International Mobile Subscriber Identity, or IMSI), or (International Mobile Equipment Identity, or IMEI) are important evidence because they reveal the service provider, allow us to obtain subscriber information, and uniquely identify the telephone. This information can be used to obtain toll records, to identify contacts by this telephone with other cellular telephones used by co-conspirators, and to identify other telephones used by the same subscriber or purchased as part of a package.

142.    The stored list of recent received, missed, and sent calls is important evidence. It identifies telephones recently in contact with the telephone user. This is valuable information in a noncitizen smuggling investigation because it will identify telephones used by other members of the organization, and further provides confirmation

AFFIDAVIT OF DAVID SPITZER - 50
USAO #2023R01258

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

of the date and time of contacts. Stored text messages are important evidence as text messages often provide key information about the user, his location, and his activities – to include messages directly related to the smuggling activity.

143.    Photographs on a cellular telephone are evidence because they help identify the user, either through his or her own picture, or through pictures of friends, family, and associates that can identify the user. These pictures may also assist in identifying or linking other individuals to the criminal organization. Furthermore, digital photos often have embedded "geocode" or GPS information embedded in them. Geocode information is typically the longitude and latitude where the photo was taken. Showing where a specific photo was taken can have evidentiary value. This location information is helpful because, for example, it can show where coconspirators meet and where coconspirators have traveled from.

144.    Finally, stored address records are important evidence because they show the user's close associates and family members, and they may contain names and nicknames connected to phone numbers that can be used to identify additional coconspirators.

## SEARCH TECHNIQUES

145.    Based on the foregoing, and consistent with Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, the warrant I am applying for will permit seizing, imaging, or otherwise copying digital devices or other electronic storage media found in the **SUBJECT VEHICLE** that reasonably appear capable of containing some or all of the data or items that fall within the scope of Attachment B to this Affidavit, and will specifically authorize a later review of the media or information consistent with the warrant.

146.    Consistent with the above, I hereby request the Court's permission to seize and/or obtain a forensic image of digital devices or other electronic storage media that reasonably appear capable of containing data or items that fall within the scope of

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Attachment B to this Affidavit, and to conduct off-site searches of the digital devices or other electronic storage media and/or forensic images, using the following procedures:

**A.      Processing the Search Sites and Securing the Data.**

a.      Upon securing the physical search site, the search team will conduct an initial review of any digital devices or other electronic storage media located at the subject premises described in Attachment A that are capable of containing data or items that fall within the scope of Attachment B to this Affidavit, to determine if it is possible to secure the data contained on these devices onsite in a reasonable amount of time and without jeopardizing the ability to accurately preserve the data.

b.      In order to examine the electronically stored information ("ESI") in a forensically sound manner, law enforcement personnel with appropriate expertise will attempt to produce a complete forensic image, if possible and appropriate, of any digital device or other electronic storage media that is capable of containing data or items that fall within the scope of Attachment B to this Affidavit.[20]

c.      A forensic image may be created of either a physical drive or a logical drive.  A physical drive is the actual physical hard drive that may be found in a typical computer.  When law enforcement creates a forensic image of a physical drive, the image will contain every bit and byte on the physical drive.  A logical drive, also known as a partition, is a dedicated area on a physical drive that may have a drive letter assigned (for example the c: and d: drives on a computer that actually contains only one physical hard drive).  Therefore, creating an image of a logical drive does not include every bit and byte on the physical drive.  Law enforcement will only create an image of physical or logical drives physically present on or within the subject device.  Creating an image of the devices located at the search locations described in Attachment A will not result in access to any data physically located elsewhere.  However, digital devices or other electronic storage media at the search locations described in Attachment A that have previously connected to devices at other locations may contain data from those other locations.

---

[20] The purpose of using specially trained computer forensic examiners to conduct the imaging of digital devices or other electronic storage media is to ensure the integrity of the evidence and to follow proper, forensically sound, scientific procedures.  When the investigative agent is a trained computer forensic examiner, it is not always necessary to separate these duties.  Computer forensic examiners often work closely with investigative personnel to assist investigators in their search for digital evidence.  Computer forensic examiners are needed because they generally have technological expertise that investigative agents do not possess.  Computer forensic examiners, however, often lack the factual and investigative expertise that an investigative agent may possess on any given case.  Therefore, it is often important that computer forensic examiners and investigative personnel work closely together.

AFFIDAVIT OF DAVID SPITZER - 52
USAO #2023R01258

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

d.      If based on their training and experience, and the resources available to them at the search site, the search team determines it is not practical to make an on-site image within a reasonable amount of time and without jeopardizing the ability to accurately preserve the data, then the digital devices or other electronic storage media will be seized and transported to an appropriate law enforcement laboratory to be forensically imaged and reviewed.

**B.      Searching the Forensic Images.**

a.      Searching the forensic images for the items described in Attachment B may require a range of data analysis techniques.  In some cases, it is possible for agents and analysts to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be commingled with criminal evidence.  In other cases, however, such techniques may not yield the evidence described in the warrant, and law enforcement may need to conduct more extensive searches to locate evidence that falls within the scope of the warrant.  The search techniques that will be used will be only those methodologies, techniques and protocols as may reasonably be expected to find, identify, segregate and/or duplicate the items authorized to be seized pursuant to Attachment B to this affidavit.  Those techniques, however, may necessarily expose many or all parts of a hard drive to human inspection in order to determine whether it contains evidence described by the warrant.

## CONCLUSION

147.    Based on the forgoing, I respectfully submit there is probable cause to believe that the **SUBJECT VEHICLE** will contain evidence of violations of Title 8, United States Code, Sections 1324(a)(1)(A)(ii), (a)(2)(B)(ii), and (a)(1)(A)(v)(I). I therefore request that the court issue a warrant authorizing a search of the **SUBJECT VEHICLE**, as more fully described in Attachment A to this Affidavit, as well as any digital devices and electronic storage media found in the **SUBJECT VEHICLE**. I therefore request that the court issue a warrant authorizing a search of the **SUBJECT VEHICLE**, as well as any digital devices and electronic storage media located therein, for the items more fully described in Attachment B hereto, incorporated herein by reference, and the seizure of any such items found therein.

AFFIDAVIT OF DAVID SPITZER - 53
USAO #2023R01258

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    148.    This warrant is being submitted via reliable electronic means. Fed. R. Crim.

2  P. 4.1 & 41(d)(3).

3

4

5

6    DAVID J. SPITZER

7    Special Agent,
     Homeland Security Investigations

8

9    The above-named agent provided a sworn statement to the truth of the foregoing

10  Affidavit by telephone on the 29th day of August 2024.

11

12

13

14    BRIAN A. TSUCHIDA
      United States Magistrate Judge

15

16

17

18

19

20

21

22

23

24

25

26

27

AFFIDAVIT OF DAVID SPITZER - 54
USAO #2023R01258

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1

## ATTACHMENT A

2

### Vehicle to be Searched

3

The **SUBJECT VEHICLE** is a gray 2019 Jeep Cherokee bearing Oregon license plate

4

number 073PDC and registered to Jesus Ortiz Plata and Blanca Elia Zamarripa Cruz, 465

5

S 13th Street, Independence, OR 97351, that was seized from Jesus ORTIZ-Plata at the

6

time of his arrest on May 23, 2024, and currently stored at the Bellingham Border Patrol

7

Station, located at 1431 Sunset Avenue, Ferndale, Washington 98248.

8

And any digital device/s or other electronic storage media found therein.

9

10

The requested authority to search extends to all areas of the vehicle, all

11

compartments, and all containers within that vehicle, whether locked or not, where the

12

items described in Attachment B could reasonably be found.

13

14



15

16

17

18

19

20

21



22

23

24

25

26

27

1

**ATTACHMENT B**

2

**Items to be Seized**

3

The following records, documents, files, or materials, in whatever form, including

4

handmade or mechanical form (such as printed, written, handwritten, or typed);

5

photocopies or other photographic form; and electrical, electronic, and magnetic form

6

(such as tapes, cassettes, hard disks, floppy disks, diskettes, compact discs, CD-ROMs,

7

DVDs, optical discs, Zip cartridges, printer buffers, smart cards, or electronic notebooks,

8

or any other electronic storage medium) that constitute evidence, instrumentalities, or

9

fruits of violations of 8 U.S.C. §§ 1324(a)(1)(A)(ii), (a)(2)(B)(ii), and (a)(1)(A)(v)(I)

10

(hereinafter referred to collectively as "Target Offenses"), those violations involving

11

Jesus ORTIZ-Plata and others unknown, and occurring from January 2022 through May

12

2024:

13

     1.     All records relating to violations of the Target Offenses, including:

14

     a.     Records of alien smuggling transactions and activities including, but

15

not limited to, documentary records and ledgers;

16

     b.     Residential rental agreements, vehicle rental agreements, storage
facility rental agreements, records of mail services;

17

     c.     Airline ticket receipts, vehicle rental receipts, credit card receipts,

18

hotel receipts, travel agency vouchers, long distance telephone call records and other
items reflecting domestic and foreign travel;

19

     d.     Maps reflecting smuggling routes, foreign fuel receipts, receipts

20

reflecting travel to and from foreign countries, receipts pertaining to the purchase and
registration of load vehicles, showing modifications to and repairs of vehicles, receipts

21

for portable radios, cellular phones, and pagers

22

     2.     U.S. Currency, money orders, prepaid/gift cards, and financial records,

23

including bank records, safe deposit box records and keys, credit card records, bills,

24

receipts, tax returns, vehicle documents, and similar items; and other records that show

25

income and expenditures, net worth, money transfers, wire transmittals, negotiable

26

instruments, bank drafts, cashier's checks, and similar items, and money counters.

27

ATTACHMENT B - 1
USAO #2023R01258

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

3.      Indicia of ownership or control over any vehicles including, but not limited to: titles, registrations, gas receipts, repair bills, and keys belonging to that vehicle;

4.      Digital devices or other electronic storage media and/or their components, which include:

a.      Any digital device or other electronic storage media capable of being used to commit, further, or store evidence of the offenses listed above;

b.      Any digital devices or other electronic storage media used to facilitate the transmission, creation, display, encoding or storage of data, including word processing equipment, modems, docking stations, monitors, cameras, printers, plotters, encryption devices, and optical scanners;

c.      Any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-R, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, and personal digital assistants;

d.      Any documentation, operating logs and reference manuals regarding the operation of the digital device or other electronic storage media or software;

e.      Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices, or data to be searched;

f.      Any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer equipment, storage devices or data; and

g.      Any passwords, password files, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or data.

5.      For any digital device or other electronic storage media upon which electronically stored information that is called for by this warrant may be contained, or that may contain things otherwise called for by this warrant:

ATTACHMENT B - 2
USAO #2023R01258

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

a.    Evidence of who used, owned, or controlled the digital device or other electronic storage media at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.    evidence of software that would allow others to control the digital device or other electronic storage media, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.    evidence of the lack of such malicious software;

d.    evidence of the attachment to the digital device of other storage devices or similar containers for electronic evidence;

e.    evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the digital device or other electronic storage media;

f.    evidence of the times the digital device or other electronic storage media was used;

g.    passwords, encryption keys, and other access devices that may be necessary to access the digital device or other electronic storage media;

h.    documentation and manuals that may be necessary to access the digital device or other electronic storage media or to conduct a forensic examination of the digital device or other electronic storage media;

i.    contextual information necessary to understand the evidence described in this attachment.

6.    Cell Phones: Cellular telephones and other communications devices may be seized, and searched for the following items:

a.    Assigned number and identifying telephone serial number (ESN, MIN, IMSI, or IMEI);

b.    Stored list of recent received, sent, and missed calls;

c.    Stored contact information;

ATTACHMENT B - 3
USAO #2023R01258

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

d.      Stored photographs and videos of narcotics, currency, evidence of suspected criminal activity, and/or the user of the phone and/or co-conspirators, including any embedded GPS data associated with these photographs;

e.      Stored text messages, as well as any messages in any internet messaging apps, including but not limited to Facebook Messenger, iMessage, Wickr, Telegram, Signal, WhatsApp, Kik, and similar messaging applications, related to the aforementioned crimes of investigation or that may show the user of the phone and/or co-conspirators, including Apple iMessages, Blackberry Messenger messages or other similar messaging services where the data is stored on the telephone;

f.      Stored documents, notes, and files that contain passwords/or encryption keys; and

g.      Evidence of user attribution showing who used or owned the cellular phone at the time the items described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames or passwords, and documents.

THE SEIZURE OF DIGITAL DEVICES OR OTHER ELECTRONIC STORAGE

MEDIA AND/OR THEIR COMPONENTS AS SET FORTH HEREIN IS

SPECIFICALLY AUTHORIZED BY THIS SEARCH WARRANT, NOT ONLY TO

THE EXTENT THAT SUCH DIGITAL DEVICES OR OTHER ELECTRONIC

STORAGE MEDIA CONSTITUTE INSTRUMENTALITIES OF THE CRIMINAL

ACTIVITY DESCRIBED ABOVE, BUT ALSO FOR THE PURPOSE OF THE

CONDUCTING OFF-SITE EXAMINATIONS OF THEIR CONTENTS FOR

EVIDENCE, INSTRUMENTALITIES, OR FRUITS OF THE AFOREMENTIONED

CRIMES.

ATTACHMENT B - 4
USAO #2023R01258

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970